JAY CLAYTON
United States Attorney for the
Southern District of New York
By:   Emily Deininger
        Assistant United States Attorney
        26 Federal Plaza, 38th Floor
        New York, New York 10278
        Telephone: (212) 637-2472

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                          :

                                                                            **VERIFIED COMPLAINT**
                    -v.-                                      :   **FOR FORFEITURE**

$15,568,273 IN UNITED STATES CURRENCY       :
                                                                                26 Civ. 5553
                                        Defendant-*in-rem*.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorney Jay Clayton, United States

Attorney for the Southern District of New York, for its verified complaint, alleges, upon

information and belief, as follows:

## I.        JURISDICTION AND VENUE

        1.        This is a civil action in rem commenced by the United States of America

pursuant to Title 18, United States Code, Section 981(a)(1)(C) seeking the forfeiture of

$15,568,273 in United States currency (the "Defendant-*in-rem*").

        2.        This Court has original jurisdiction over this forfeiture action pursuant to

Title 28, United States Code, Section 1345 and 1355.

        3.        Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A)

because certain actions and omissions giving rise to forfeiture took place in the Southern District

of New York.

4.      As set forth below, the Defendant-*in-rem* is subject to forfeiture pursuant to Title 18, United States Code, 981(a)(1)(C) and 984, as property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1343 and 1349.

## II.      BACKGROUND

5.      In or about 2003, the Government began investigating a long-running and extremely successful scheme (the "Scheme") that involved designing, marketing, implementing, and defending tax shelters using means and methods intended to deceive the IRS from approximately 1998 through approximately 2003, that resulted in at least $1.3 billion in false and fraudulent tax losses. During the course of the investigation the Government identified BDO Seidman LLP (later known as BDO USA, LLP) ("BDO"), a major international accounting firm, as being involved in the Scheme.

6.      BDO provided audit services to many corporate clients, and provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. Those tax services included preparing tax returns, providing tax advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

7.      In or about late 1998, BDO entered into an alliance with the law firm of Jenkens & Gilchrist ("J&G"), pursuant to which BDO assisted in the design, marketing, and implementation of certain J&G tax shelters to BDO's clients and potential clients, acted as a referral source for clients to purchase certain J&G tax shelters, and prepared certain of the income tax returns reporting the tax benefits of the tax shelters. In return, J&G paid BDO a portion of the fees J&G collected from clients as a result of the sale of the tax shelters. Beginning in or about the

Fall of 1999, BDO charged its tax shelter clients its own fee, in addition to the fee it received from J&G on the BDO clients' tax shelter sales.

8.    From at least in or about 1998 through at least in or about 2003, BDO and its co-conspirators participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the tax shelters were marketed and implemented.

9.    BDO and its co-conspirators designed marketed, and implemented fraudulent tax shelters with J&G known as the Short Sale and Short Options Strategy ("SOS") tax shelters (collectively hereinafter "the BDO tax shelters") for clients through false and fraudulent means; prepared and caused to be prepared, and filed and caused to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent tax shelter losses, resulting in the payment of far lower taxes by the clients; and fraudulently concealed from and misrepresented the true nature of the tax shelters to the IRS, in order to enrich themselves personally through the generation of extraordinary fee income.    Certain co-conspirators also utilized tax shelters to evade their own taxes on income received largely through the sale of the fraudulent tax shelters.

10.    BDO and its co-conspirators designed, marketed, and implemented the BDO tax shelters—portrayed to clients as turnkey tax eliminations products (*i.e.*, pre-packaged and all-inclusive products)—as a means for wealthy individuals generally with multi-million dollar taxable income or gains to fraudulently eliminate or reduce the tax paid to the IRS on that income or gains.    Thus, instead of the wealthy clients paying U.S. individual income taxes generally between 20% and 40% of their taxable income, the clients could choose the amount of tax loss or

3

benefits, and pay BDO, co-conspirators, and others a fee generally equal to 5 to 10% of the desired tax loss or benefit. This all-inclusive cost included the fees of BDO, J&G, third-party referral sources, and/or others, as well as the net premium to Deutsche Bank used to execute the purported "investments" that were designed to make it appear that he shelters were legitimate investments rather than tax shelters. The size of the purported investments and the amount of the fees paid to BDO and its co-conspirators and others were determined based on the tax loss to be generated.

11. BDO and its co-conspirators understood that if the IRS were to detect the clients' use of the respective tax shelters and learn the true facts and circumstances surrounding their design, marketing, and implementation, including their lack of both economic substance and genuine business purpose, the IRS would disallow the claimed tax benefits, and seek to impose substantial penalties, in additional to the tax and interest owed. Accordingly, BDO and its co-conspirators undertook to prevent the IRS from: (i) detecting their clients' use of these tax shelters; (ii) understanding how the steps of the tax shelters operated to produce the purported tax benefits claimed by the clients; (iii) learning that these tax shelters were marketed as cookie-cutter products that were designed to and did significantly reduce or eliminate the clients' tax obligations; (iv) learning that any potential payout from the financial product used in the tax shelter could never overcome the total fees required to engage in the tax shelters; (v) learning that the clients were not genuinely seeking profit-making opportunities, but were, instead, seeking huge tax benefits; and (vi) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by BDO and its co-conspirators to lead to the specific tax losses sought by the clients.

### III.    THE DEFENDANT-*IN-REM*

12.    On or about June 6, 2012, BDO entered into a Deferred Prosecution Agreement (the "DPA") with the United States with respect to the Scheme. Under the terms of the DPA, BDO agreed that it would pay a total of $15,568,273 in United States currency that would be forfeited to the United States.   BDO agreed to satisfy its forfeiture obligation by making seven annual payments of $2,000,000 starting May 1, 2018, and an eighth payment of $1,568,273 on May 1, 2025.

13.    BDO made the required payments and the Defendant-*in-rem* constitutes the total forfeiture payments agreed to under the DPA.

14.    The DPA and the accompanying Statement of Facts are incorporated by reference and attached hereto as Exhibit A.

### IV.    FIRST CLAIM FOR FORFEITURE

**(Property Constituting or Derived from Proceeds Traceable to a Violation of 18  U.S.C. §§ 1343 and 1349, or Property Traceable to Such Property)**

15.    Paragraphs 1 through 14 of this Complaint are repeated and re-alleged as if fully set forth herein.

16.    Pursuant to Title 18, United States Code Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in Section 1956(c)(7) of this title, or a conspiracy to commit such offense, is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(C).

17.    For purposes of Section 1956, "specified unlawful activity" includes "[a]ny act or activity constituting an offense listed in section 1961(1) of this title…" 18 U.S.C. § 1956(c)(7)(A).   Section 1961(1) lists, among other things, wire fraud (Section 1343).

18.     In addition, Title 18, United States Code, Section 1349 provides:

Any person who attempts or conspires to commit any offense under this chapter [including mail fraud or wire fraud] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

19.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 18, United States Code, Sections 1343 and 1349, or as property traceable to such property.

## V.     CONCLUSION

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
       June 30, 2026

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By:     _____
        Emily Deininger
        Assistant United States Attorney
        26 Federal Plaza, 38th Floor
        New York, New York 10278
        Telephone: (212) 637-2472

6

## DECLARATION OF VERIFICATION

Sergio Sobolev, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Internal Revenue Service; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on June 30, 2026

_____
Sergio Sobolev
Special Agent
Internal Revenue Service

7